# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3264

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Jeffrey Thomas, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 15, 2006
Filed: June 28, 2006

_____

Before ARNOLD, JOHN R. GIBSON, and SMITH, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After several people complained to the authorities that Jeffrey Thomas took their money but failed to use it as promised on the construction of their homes, the government indicted him on five counts of mail fraud, *see* 18 U.S.C. § 1341, one count of wire fraud, *see* 18 U.S.C. § 1343, two counts of money laundering, *see* 18 U.S.C. § 1957, and one count of bank fraud, *see* 18 U.S.C. § 1344. A jury acquitted Mr. Thomas of one of the mail fraud counts, but returned a verdict of guilty on the other charges. The district court[1] sentenced Mr. Thomas to 172 months in

_____

[1]The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

prison. He appeals, arguing that a number of assigned errors require reversal. We affirm.

## I.

We begin by addressing Mr. Thomas's argument that federal agents violated the fourth amendment when they seized unopened mail from a Mail Boxes Etc. store where he had once rented a mailbox. The district court, adopting the recommendation of the magistrate judge,[2] denied Mr. Thomas's motion to suppress the evidence obtained from Mail Boxes Etc. on the ground that he had abandoned his mail there. Abandoned property is outside the scope of fourth amendment protection because its owner has forfeited any expectation of privacy in it. *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997), *cert. denied*, 522 U.S. 1061 (1998). We review a finding of abandonment for clear error. *Id.*

The evidence presented at the suppression hearing established that in the course of investigating Mr. Thomas, an FBI agent visited the mailing address of one of his businesses. The address in question turned out to be that of a private postal service, Mail Boxes Etc. The agent spoke to the owner of the store and learned that after Mr. Thomas opened the mailbox he had authorized three people to use it. The store owner also told the FBI agent that nobody had come to pick up the mail or make the required payment for the mailbox in more than a year. The FBI agent testified that the store owner told him that the mail "was abandoned, and that he was going to throw it in the dumpster if he didn't give it to me [the agent]." The FBI agent took the mail and eventually opened and read it.

We believe that the district court correctly determined that Mr. Thomas had abandoned the mail and, consequently, any reasonable expectation of privacy in it.

---

[2]The Honorable Audrey G. Fleissig, United States Magistrate Judge for the Eastern District of Missouri.

Mr. Thomas's failure to make any of the required payments and to retrieve any of the mail for longer than a year is sufficient to establish abandonment. *Cf. United States v. Robinson*, 390 F.3d 853, 873 (6th Cir. 2004); *United States v. Sampol*, 636 F.2d 621, 683-84 (D.C. Cir. 1980). We also do not think that the provision in the agreement with Mr. Thomas authorizing Mail Boxes Etc. to "discard or destroy any mail or package" that remained unclaimed for longer than 30 days created an ongoing expectation of privacy in the unclaimed mail. Although we have held that specific instructions from the owner to destroy private materials are "the ultimate manifestation of privacy, not abandonment," *see United States v. James*, 353 F.3d 606, 616 (8th Cir. 2003), the contractual provision relevant here did not require Mail Boxes Etc. to destroy the material; it merely gave it the option to do so. We therefore reject Mr. Thomas's argument that the seizure of the mail violated his fourth amendment rights.

II.

Mr. Thomas next assigns error in the district court's decision to adjourn the trial for several weeks, in the middle of the government's case. Mr. Thomas contends that the court should have granted his motion for a mistrial rather than take such a lengthy break in the proceedings. We review the district court's action for an abuse of discretion. *See United States v. Hollins*, 432 F.3d 809, 812 (8th Cir. 2005).

When Mr. Thomas's trial began, the jury was seated with one alternate juror. During the government's case, one of the jurors was excused to attend the funeral of a family member; this left twelve members of the jury with no alternate jurors. The next day, one of the remaining jurors fell and injured herself seriously enough to require surgery. After Mr. Thomas declined to proceed with eleven jurors, the district court polled the jurors about their availability and decided to adjourn the case and resume it several weeks later, after the injured juror's surgery. Mr. Thomas objected to the delay and moved for a mistrial, which the district court denied. The court reconvened the trial twenty-four days later, but Mr. Thomas failed to appear on that

day, apparently because he had checked himself into the hospital. Mr. Thomas did appear in court later that week and the trial proceeded to verdict.

Mr. Thomas contends that the district court abused its discretion when it denied his motion for mistrial and granted a lengthy continuance. We disagree. Faced with several juror emergencies and conflicts, the court consulted with the jurors and the parties to craft a solution that would allow the trial to continue. Before its adjournment, the district court reminded the jurors that they were bound by the court's original instructions, that they were not to discuss the case with anybody, and that they should keep an open mind until the case concluded. In a similar case, the Fourth Circuit decided that a district court acted within its discretion when it took a mid-trial recess of thirty-two days. *See United States v. Smith*, 44 F.3d 1259, 1267-68 (4th Cir. 1995), *cert. denied*, 514 U.S. 1113 (1995). We conclude that the precautions taken by the district court in this case preclude us from finding any abuse of discretion.

## III.

Two of the counts against Mr. Thomas related to a scheme to defraud IndyMac Bank by selling his house to his girlfriend, Tracy Savage, at an inflated value. The indictment charged Mr. Thomas with aiding and abetting his girlfriend's attempt to defraud the bank by filing a false loan application. As part of its proof, the government offered into evidence the bank's conversation log, in which its employees recorded the substance of conversations that they had with customers about pending loans.

Mr. Thomas contends that the district court erred in admitting the conversation log because it was hearsay. More precisely, Mr. Thomas contends that the exhibit contained double hearsay: statements attributed to Ms. Savage and the IndyMac employee's account of those statements in the conversation log. Mr. Thomas concedes that the IndyMac employee's statements themselves qualify for the business-records

-4-

exception to the hearsay rule, *see* Fed. R. of Evid. 803(6), but he argues that the employee's account of Ms. Savage's statements was not admissible.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. of Evid. 801(c). With a number of exceptions, *see* Fed R. Evid. 803, 804, 807, such statements are inadmissible because of concerns about their reliability. *See* Fed R. Evid. 802; G. Michael Fenner, The Hearsay Rule 5-9 (2003). "We review de novo the district court's interpretation and application of the rules of evidence." *United States v. Smith*, 383 F.3d 700, 706 (8th Cir. 2004), *cert. denied*, 126 S. Ct. 1567 (2006).

Because the parties agree that the conversation log that IndyMac's employees generated qualifies as a business record, we are concerned only with Ms. Savage's alleged statements to the IndyMac employee. The conversation log indicated that Ms. Savage called on several occasions to inquire about obtaining copies of certain documents related to her loan, to ask whether any other people had contacted IndyMac about her loan, and to instruct IndyMac employees to notify her if they did receive outside inquiries about the loan. The government believed these questions indicated that Ms. Savage was concerned about any investigation into the loan because of its fraudulent nature.

We find no error in the admission of these statements. We first note that Mr. Thomas did not make an objection to most of what was in the conversation log; in fact, he objected to the admission of only one portion of it. Second, even if an objection had been raised with respect to the entire conversation log, it could not have been properly sustained. None of the questions and instructions attributed to Ms. Savage in the conversation log falls within the hearsay prohibition for the simple reason that none of them was offered for the truth of an assertion. The government was offering Ms. Savage's contacts with IndyMac to show that she was worried about

the government investigating the transaction. The inferences that the government was asking the jury to draw could hardly have been based on the "truth" of her questions and instructions to IndyMac's representatives. Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay. *See United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999), *cert denied*, 528 U.S. 987 (1999); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990)*; United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990); *United States v. Vest*, 842 F.2d 1319, 1330 (1st Cir. 1988), *cert. denied*, 488 U.S. 965 (1988). We detect no error here.

IV.

Mr. Thomas challenges the sufficiency of the evidence for several of his convictions. Our standard of review for challenges of this sort is strict: We will affirm a conviction if the evidence, viewed in the light most favorable to the government, could have convinced a reasonable jury that Mr. Thomas was guilty beyond any reasonable doubt. *See United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

A.

Mr. Thomas challenges his convictions on counts six and seven, the two money-laundering counts. To convict Mr. Thomas of money laundering, the government had to prove that he knowingly engaged in a monetary transaction in criminally derived property worth more than $10,000. *See* 18 U.S.C. § 1957. Mr. Thomas contends that the transactions alleged by the government did not involve criminally derived property because the alleged fraud that was the source of the funds had not been completed when the transactions charged as money laundering took place.

Mr. Thomas relies on the decision in *United States v. Johnson*, 971 F.2d 562 (10th Cir. 1992). In *Johnson*, the Tenth Circuit reversed convictions under § 1957 that stemmed from a series of wire deposits from investors into the account of the

defendant. The court, after noting that "the term 'criminally derived property' means any property constituting, or derived from, proceeds *obtained* from a criminal offense," 18 U.S.C. § 1957(f)(1) (emphasis added), agreed with the defendant that the illegal transaction by which he first received the property could not be the basis for a charge of money laundering. "Whether or not the funds that were wired to the defendant were 'criminally derived property' depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not." *Id.* at 569-70.

Though we agree with the reasoning in *Johnson*, the case provides no basis for overturning Mr. Thomas's convictions. In *United States v. Mankarious*, 151 F.3d 694 (7th Cir. 1998), *cert. denied*, 525 U.S. 1056 (1998) the Seventh Circuit, construing a closely-related statute, explored in great detail the case law interpreting the phrase "criminally derived property" in § 1957 The court acknowledged that other cases, including *Johnson*, might be read to require that all elements of the underlying crime must be completed before money laundering can occur, but it concluded that the cases actually "stand for the rule that [separate] predicate offenses must produce proceeds before anyone can launder those proceeds." *Id.* at 703-05. "[M]oney laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." *Id.* at 705.

We agree with this approach and have little trouble affirming Mr. Thomas's convictions under it. Unlike *Johnson*, the indictment in this case did not allege that Mr. Thomas's receipt of funds from his alleged victims was the transaction giving rise to criminal culpability under § 1957. In count six, the indictment alleged that Mr. Thomas obtained money from his clients on September 13, 2002, as part of his ongoing fraudulent activity, but it tied the money-laundering allegation to Mr. Thomas's transfer of the money to his personal mortgage account twelve days later, on September 25. In count seven, the government alleged that Mr. Thomas obtained the money on October 26, 2002, but it identified the money-laundering

transaction as Mr. Thomas's liquidation of a cashier's check on December 24, 2002. Because the evidence presented at trial, viewed in the light most favorable to the government, was sufficient for the jury to determine that Mr. Thomas's transactions on September 25 and December 24 involved "proceeds obtained" from ongoing fraudulent activities, *see* 18 U.S.C. § 1957(f)(1), we affirm those convictions.

B.

Finally, Mr. Thomas contends that the government failed to present evidence sufficient to support his convictions on the bank fraud count and one mail fraud count, which involved the purported sale of his house to Ms. Savage. To convict Mr. Thomas of bank fraud, the government had to demonstrate that he aided and abetted an attempt to execute a scheme to obtain property under the control of IndyMac Bank by means of fraud, that he did so with the intent to defraud, and that IndyMac was insured by the Federal Deposit Insurance Corporation. *See* 18 U.S.C. §§ 2, 1344; 8th Cir. Manual of Model Crim. Jury Instr. 6.18.1344 (2005). The last element is undisputed.

The heart of Mr. Thomas's argument is that the evidence at trial supported only the inference that Ms. Savage acted alone when she filed a fraudulent loan application with IndyMac. We disagree. The government presented evidence from which a reasonable jury could have determined that Mr. Thomas was in financial distress when he entered into a sales agreement with Ms. Savage for property that he knew she could not afford, that the purchase price for the house in the agreement was grossly inflated, and that he knew that Ms. Savage's loan application contained several false statements. Particularly persuasive is Mr. Thomas's testimony when asked at trial why he did not collect the $174,800 in down payment that Ms. Savage reported giving to him in her loan application: He responded that the down payment was to come from the proceeds of the loan. The jury could have determined that this evidence proved beyond any reasonable doubt that Mr. Thomas knew of Ms. Savage's false statements

to IndyMac and assisted her in making them with the intent of obtaining the loan proceeds.

As for the related mail fraud count, we again find Mr. Thomas's arguments wanting. In addition to the evidence discussed above, we note that a search of Mr. Thomas's car while the loan was pending yielded copies of Ms. Savage's loan application materials with their UPS envelopes. Viewing this evidence in a light most favorable to the government, the jury could have found Mr. Thomas guilty of aiding and abetting an attempt to obtain IndyMac's money by means of false representations, with the intent to defraud, where it was foreseeable that UPS would be used and that UPS was used in furtherance of the attempt. *See* 18 U.S.C. §§ 2, 1341; 8th Cir. Manual of Model Crim. Jury Instr. 6.18.1344 (2005).

## V.

For the reasons stated, we affirm the judgment of the district court.

_____